USCA1 Opinion

 

 September 28, 1993 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT _________________________ No. 93-1171 VOTE CHOICE, INC., ET AL., Plaintiffs, Appellees, v. JOSEPH DiSTEFANO, ETC., ET AL., Defendants, Appellees. _________________________ ELIZABETH LEONARD, Plaintiff, Appellant. No. 93-1236 VOTE CHOICE, INC., ET AL., Plaintiffs, Appellees, v. JOSEPH DiSTEFANO, ETC., ET AL., Defendants, Appellants. _______________________ ERRATA SHEET ERRATA SHEET The order of the court issued on August 31, 1993 is corrected as follows: On page 24, lines 14, 15 and 16 replace the cite to "Adams v. Watson, . . . slip op. at 7 n.8]." with "Association of _____ ______ ______________ Data Processing Serv. Orgs. v. Camp, 397 U.S. 150, 153 (1970)." ___________________________ ____ [SYSTEMS NOTE: Appendix available at Clerk's Office] August 31, 1993 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT _________________________ No. 93-1171 VOTE CHOICE, INC., ET AL., Plaintiffs, Appellees, v. JOSEPH DiSTEFANO, ETC., ET AL., Defendants, Appellees, _________________________ ELIZABETH LEONARD, Plaintiff, Appellant. _________________________ No. 93-1236 VOTE CHOICE, INC., ET AL., Plaintiffs, Appellees, v. JOSEPH DiSTEFANO, ETC., ET AL., Defendants, Appellants. _________________________ APPEALS FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND [Hon. Raymond J. Pettine, Senior U.S. District Judge] __________________________ _________________________ Before Selya, Cyr and Boudin, Circuit Judges. ______________ _________________________ Neal J. McNamara, with whom Matthew F. Medeiros was on _________________ _____________________ brief, for plaintiff Elizabeth Leonard (No. 93-1171) and for plaintiffs-appellees (No. 93-1236). Donald J. Simon, with whom Sonosky, Chambers, Sachse & _________________ _____________________________ Endreson was on brief for Common Cause and Common Cause of R.I., ________ amici curiae (No. 93-1171). Anthony J. Bucci, Jr., with whom Licht & Semonoff was on ______________________ _________________ brief, for defendants Joseph DiStefano, et al. Donald J. Simon, with whom Sonosky, Chambers, Sachse & _________________ _____________________________ Endreson, Roger M. Witten, Carol F. Lee, W. Hardy Callcott, Eric ________ _______________ ____________ _________________ ____ J. Mogilnicki, and Wilmer, Cutler & Pickering were on brief, for ______________ __________________________ Common Cause and Common Cause of R.I., amici curiae (No. 93- 1236). _________________________ _________________________ SELYA, Circuit Judge. These consolidated appeals, SELYA, Circuit Judge. _____________ which implicate various aspects of Rhode Island's campaign finance law, necessitate the exploration of largely uncharted constitutional terrain. One appeal, prosecuted on behalf of the state, seeks to reinstate a statute requiring certain political action committees (PACs)1 to disclose information about all their contributors. The other appeal, prosecuted by an unsuccessful gubernatorial candidate, Elizabeth Leonard, inveighs against state statutes that bestow special advantages on candidates who comply with eligibility requirements for public campaign financing. At the end of our journey across terra _____ incognita, we conclude that the district court acted _________ appropriately both in striking down the first dollar disclosure requirement and in upholding the incentive provisions. Therefore, we affirm. I. BACKGROUND I. BACKGROUND Before addressing the merits, we offer an overview of Rhode Island's campaign finance law and a brief synopsis of the proceedings below. In so doing, we strive to place each challenged provision in its overall statutory context and to  ____________________ 1Rhode Island law defines a PAC as any group of two (2) or more persons which accepts any contributions to be used for advocating the election or defeat of any candidate or candidates or to be used for advocating the approval or rejection of any question or questions submitted to the voters. R.I. Gen. Laws 17-25-3(j) (Supp. 1992). 3 describe the nature of the disagreement surrounding it. A. Statutory Framework: The State's Appeal. A. Statutory Framework: The State's Appeal. ________________________________________ Rhode Island has a set of laws regulating the financing of state and local election campaigns. See R.I. Gen. Laws 17- ___ 25-1 to 17-25-30.1 (1988 & Supp. 1992). The entity charged with primary responsibility for implementing these laws is the Rhode Island Board of Elections. See id. at 17-25-5. ___ ___ Rhode Island law directs all PACs and candidates to file reports with the Board of Elections at regular intervals. See id. at 17-25-11. The Board then "prepare[s] and make[s] ___ ___ available for public inspection . . . summaries of all reports." Id. at 17-25-5(a)(4). The reports are to include the name, ___ address, and place of employment of every person or entity contributing more than $100 to the reporting PAC or candidate. See id. at 17-25-7. ___ ___ In 1992, the Rhode Island General Assembly, desirous of ensuring that the voting public possesses accurate information about organizations whose contributions and expenditures may influence elections, devised extra reporting obligations for PACs. Every PAC now must file a notice listing its goals and purposes, the positions it plans to advocate on ballot questions, the names of any candidates it intends to support, and the names and addresses of its officers. See id. at 17-25-15(a). ___ ___ Moreover, every PAC must report the name and address of all persons to whom it makes expenditures, indicating the amount and purpose of each such payment. See id. at 17-25-15(c)(2). The ___ ___ 4 Board of Elections is empowered to halt PACs from using names which are misleading or which do not accurately identify a committee's membership and contributor base. See id. at 17-25- ___ ___ 15(d). Under the neoteric amendments, PACs must also "include in each report required to be filed . . . [t]he source and amount of all funds received." Id. at 17-25-15(c)(1). This added ___ requirement of "first dollar disclosure" the duty to disclose the identity of, and the amount given by, every contributor, no matter how modest the contribution applies to most PACs, but does not apply in the same way to PACs sponsored by labor unions or those which are funded through payroll checkoff plans. See ___ id. The requirement does not apply to candidates at all. ___ B. Statutory Framework: Leonard's Appeal. B. Statutory Framework: Leonard's Appeal. ______________________________________ In addition to regulating campaign contributions, Rhode Island also affords public funding to gubernatorial candidates.2 See id. at 17-25-18. Candidates may elect whether or not to ___ ___ accept such funds. See, e.g., id. at 17-25-19. If a candidate ___ ____ ___ elects to participate, and meets the law's eligibility requirements,3 the state will match money raised from private  ____________________ 2From and after January 1, 1993, candidates for certain other statewide offices are also eligible to receive public funding. See R.I. Gen. Laws 17-25-20. Withal, because ___ Leonard's appeal arises in the context of the 1992 elections, we limit our discussion to gubernatorial candidates. 3The eligibility criteria are set forth in R.I. Gen. Laws 17-25-20. We attach a statutory appendix that includes key provisions of Rhode Island's campaign finance law as they stood in the time frame of the 1992 elections. 5 sources up to a maximum of $750,000. See id. In return, the ___ ___ state requires participants to observe certain restrictions on campaign spending and related activities. A candidate must signify a desire to use public funds for campaign purposes upon formally declaring his or her candidacy for office.4 See id. A candidate choosing this ___ ___ option must sign a sworn statement pledging to comply with the various terms and conditions of the grant. See id. at 17-25- ___ ___ 20(1). Once made or omitted, the election and pledge are irrevocable. See id. at 17-25-19, 17-25-20(1). Thereafter, a ___ ___ participating candidate must meet the law's threshold requirements, limit the use of public funds received to certain  ____________________ 4Under Rhode Island law, persons seeking state elective office must file formal declarations of candidacy in June of the year in which the election is to be held. See R.I. Gen. Laws  ___ 17-14-1. For purposes of the campaign finance act, however, a person may be considered a candidate at an earlier time: The term "candidate" means any individual who undertakes any action, whether preliminary or final, which is necessary under the law to qualify for nomination for election, or election to public office, and/or any individual who receives a contribution or makes an expenditure or gives his or her consent for any other person to receive a contribution or make an expenditure with a view to bringing about his or her nomination or election to any public office, whether or not the specific public office for which he or she will seek nomination or election is known at the time the contribution is received or the expenditure is made and whether or not he or she has announced his or her candidacy or filed a declaration of candidacy at that time. R.I. Gen. Laws 17-25-3(a). 6 enumerated purposes, compare R.I. Gen. Laws 17-25-20(7) & (8) _______ (listing permissible uses) with id. at 17-25-7.2 (describing ____ ___ permissible uses of privately raised funds), abide by overall expenditure ceilings and fundraising caps,5 see, e.g., id. at  ___ ____ ___ 17-25-20(2), and return a percentage of any unexpended funds. See id. at 17-25-25. ___ ___ To make the offer of public financing more attractive and thereby increase participation, the 1992 amendments included a contribution cap gap. A candidate can ordinarily receive up to $1,000 from any given person or PAC in a single calendar year. See id. at 17-25-10.1. The amendment doubled this limit for ___ ___ publicly funded candidates, see id. at 17-25-30(3), and, in the ___ ___ bargain, created a cap gap between privately and publicly funded candidates. At the same time, the legislature ordained that candidates who comply with the eligibility criteria for public financing would be [e]ntitled to an additional benefit of free time on community antenna television to be allocat[ed] pursuant to rules determined by the administrator for the division of public utilities. Id.; see also id. at 17-25-30.1 (obligating state public ___ ___ ____ ___ utilities administrator to formulate relevant rules). Such candidates are also entitled to "free time on any public  ____________________ 5A publicly financed candidate may exceed these limits if a privately funded opponent exceeds them. See R.I. Gen. Laws  ___ 17-25-24. Nevertheless, the publicly financed candidate confronts a temporal impediment; he or she may raise additional money only in proportion to the amount already expended by a _______ ________ privately funded opponent. See id. ___ ___ 7 broadcasting station operating under the jurisdiction of the Rhode Island public telecommunications authority." Id. at 17- ___ 25-30(2). C. Proceedings Below. C. Proceedings Below. _________________ Two PACs (Vote Choice and Gun Owners PAC), certain individuals who wish to contribute anonymously to each, and the Rhode Island affiliate of the American Civil Liberties Union brought suit in the district court seeking to enjoin the Board of Elections from enforcing R.I. Gen. Laws 17-25-15(c)(1). They posited that the provision self-destructed on three separate bases, viz., (1) the first amendment bars any attempt to mandate ____ first dollar disclosure of political contributors' identities; (2) Rhode Island's first dollar disclosure law, when placed in its statutory context, places an impermissible burden on associational rights; and (3) the proviso denies the plaintiffs equal protection. The Board and two amici, Common Cause and Common Cause of Rhode Island, eventually took up the cudgels in defense. In the same complaint, Leonard sought to enjoin the Board of Elections, the Rhode Island Division of Public Utilities, and the Rhode Island Public Telecommunications Authority from implementing the contribution cap gap and the free-television-time incentive provisions.6 She argued that  ____________________ 6The chief executive officer of each entity, sued in his official capacity, is a named defendant. Clearly, however, the state is the real party in interest. We treat the appeals accordingly. 8 these enactments violate the first amendment in a variety of ways, and, moreover, that federal law, specifically 47 U.S.C. 315 (1988), preempts the statutory grant of free television time. The state resisted these exhortations on the merits and also contended that Leonard lacked standing because she did not face a publicly funded opponent in the general election.7 The amici supported the state's position. The district court merged the hearing on preliminary injunction with trial on the merits. See Fed. R. Civ. P. ___ 65(a)(2). After taking testimony, the court held first dollar disclosure, in and of itself, to be unconstitutional and invalidated R.I. Gen. Laws 17-25-15(c)(1) on that basis. See ___ Vote Choice v. DiStefano, 814 F. Supp. 195, 199-202 (D.R.I. ____________ _________ 1993). The court also ruled that, although Leonard had standing to mount a constitutional challenge, id. at 204, her contentions ___ were impuissant. See id. at 207. The Board appeals from the ___ ___ district court's nullification of the first dollar disclosure rule and Leonard appeals from the court's refusal to outlaw the contribution cap gap and the free-television-time incentives. II. THE STATE'S APPEAL II. THE STATE'S APPEAL The first amendment is incorporated into the fourteenth amendment and, in that way, constrains state action. See New ___ ___ York Times Co. v. Sullivan, 376 U.S. 254, 276-77 (1964) (ruling ______________ ________  ____________________ 7Leonard sought the Republican nomination for governor without party endorsement. She prevailed in the primary election and carried the party's standard in the general election. She did not opt for public funding. Her opponent in the general election, Governor Sundlun, likewise eschewed public funding. 9 that the free speech clause applies to the states through the fourteenth amendment; collecting cases). Accordingly, our consideration of R.I. Gen. Laws 17-25-15(c)(1) starts with a discussion of whether first dollar disclosure provisions are always repugnant to the first amendment. Concluding (contrary to the court below) that they are not, we then examine whether the particular first dollar disclosure provision here at issue passes the test of constitutionality. A. The Per Se Challenge. A. The Per Se Challenge. ____________________ The district court struck down R.I. Gen. Laws 17-25- 15(c)(1) as per se violative of the first amendment, concluding ___ __ that a state legislature "must establish at least some [non-zero] minimum threshold for public disclosure of contributions to PACs." Vote Choice, 814 F. Supp. at 202. Because this holding ___________ deals with a matter of law rather than fact it rests squarely on the district court's sculpting of the first amendment's contours our review is plenary. See LeBlanc v. B.G.T. Corp., ___ _______ ____________ 992 F.2d 394, 396 (1st Cir. 1993). It is old hat that compelled disclosure of information about a person's political contributions "can seriously infringe on [the] privacy of association and belief guaranteed by the First Amendment." Buckley v. Valeo, 424 U.S. 1, 64 (1976) (per _______ _____ curiam) (collecting cases). Thus, courts routinely subject statutes mandating revelation of contributors' identities in the arena of political speech to exacting scrutiny. See, e.g., ___ ____ Gibson v. Florida Legislative Investigation Comm., 372 U.S. 539, ______ ________________________________________ 10 546 (1963). A disclosure statute may survive such scrutiny only if it satisfies a two-part test: (1) the statute as a whole must serve a compelling governmental interest, and (2) a substantial nexus must exist between the served interest and the information to be revealed. See Brown v. Socialist Workers '74 Campaign ___ _____ _______________________________ Comm., 459 U.S. 87, 91-92 (1982); Buckley, 424 U.S. at 64. _____ _______ With respect to the test's first prong, no fewer than three governmental interests have proven sufficient, in varying circumstances, to justify obligatory disclosure of contribution- related information. Thus, forced disclosure may be warranted when the spotlighted information enhances voters' knowledge about a candidate's possible allegiances and interests, inhibits actual and apparent corruption by exposing large contributions to public view, or aids state officials in enforcing contribution limits. See Brown, 459 U.S. at 92; Buckley, 424 U.S. at 66-68. Because ___ _____ _______ R.I. Gen. Laws 17-25-15(c)(1), read as part of an integrated whole, plainly satisfies this prong of the test indeed, the Rhode Island statute appears to advance the three interests we have mentioned in much the same fashion as did the statute before the Buckley Court we proceed directly to the difficult question _______ of whether a substantial relationship exists between the precise modicum of information required to be disclosed and some compelling state interest. We agree with the plaintiffs that, in certain respects, the fit required to meet the test's second prong is lacking. As the disclosure threshold drops toward zero, the bond between the 11 information revealed and the governmental interests involved becomes weaker and, therefore, more tenuous. See, e.g., Buckley, ___ ____ _______ 424 U.S. at 83-84. Common sense suggests that information about the source of a $1 contribution does not advance the state's interest in deterring actual or apparent corruption because such a donation has a limited (perhaps nonexistent) potential to exact an illegal or unethical quid pro quo. Similarly, such ____ ___ ___ information bears little discernible relation to the state's interest in enforcing contribution limits that dip no lower than $1,000: few persons will donate $1 to a PAC on more than 1,000 separate occasions and those that try will likely grow arm- weary in the process. But, viewed from another, equally proper, angle, the fit is quite comfortable: signals are transmitted about a candidate's positions and concerns not only by a contribution's size but also by the contributor's identity. See Goland v. ___ ______ United States, 903 F.2d 1247, 1261 (9th Cir. 1990); FEC v. ______________ ___ Furgatch, 807 F.2d 857, 862 (9th Cir.), cert. denied, 484 U.S. ________ _____ ______ 850 (1987); see also First Nat'l Bank v. Bellotti, 435 U.S. 765, ___ ____ _________________ ________ 791-92 & n.32 (1978) (discussing required disclosure of corporate advertisers' names). Since the identity of a contributor is itself informative, quite apart from the amount of the contribution, a candidate's ideological interests may often be discerned as clearly from a $1 contribution as from a $100 contribution. Hence, we conclude that there is a substantial link between data revealed by first dollar disclosure and the 12 state's compelling interest in keeping the electorate informed about which constituencies may command a candidate's loyalties.8 Buckley buttresses this conclusion. There, in _______ evaluating whether a $10 recordkeeping threshold and a $100 disclosure threshold passed constitutional review, the Court admonished that decisions about "the appropriate level at which to require recording and disclosure" are "necessarily . . . judgmental" and, therefore, best left to legislative discretion. Buckley, 424 U.S. at 83. Consequently, so long as legislatively _______ imposed limitations are not "wholly without rationality," courts must defer to the legislative will. Id. We think that this ___ approach is fully transferable to the instant case. Because the notion of first dollar disclosure is not entirely bereft of rationality as we have already indicated, such a requirement relates to at least one sufficiently cogent informational goal any general embargo against first dollar disclosure statutes would be inconsistent with the Buckley Court's insistence upon _______ judicial deference to plausible legislative judgments. Nor does Buckley stand alone in support of the _______ conclusion that the Constitution does not prohibit all first ___  ____________________ 8In this respect, the goal of enhancing voter awareness about the interests to which a candidate may be responsive is separate and distinct from the goal of thwarting corruption. The former is best served by compulsory disclosure of data about all the various sorts of philosophical and ideological interests to which a candidate may be sensitive while the latter is equally well served by targeting a particular form of quid pro quo ____ ___ ___ "responsiveness." See generally Buckley, 424 U.S. at 66-68. ___ _________ _______ While first dollar disclosure furthers the former goal, it does not meaningfully advance the latter goal. 13 dollar disclosure statutes. Other trail markers, like spoor for the cognoscenti, lead in the same direction. See, e.g., Brown, ___ ____ _____ 459 U.S. at 89 & n.2 (specifically noting that a statute mandated first dollar disclosure, yet failing to identify any potential constitutional infirmity); Citizens Against Rent Control v. City _____________________________ ____ of Berkeley, 454 U.S. 290, 300 (1981) (stating that "if it is ___________ thought wise, legislation can outlaw anonymous contributions") (dictum); cf. California Bankers Ass'n v. Schultz, 416 U.S. 21, ___ _________________________ _______ 55-56 (1974) (holding that the first amendment does not create a per se rule forbidding disclosure of contributor names in all ___ __ situations); Oregon Socialist Workers 1974 Campaign Comm. v. ________________________________________________ Paulus, 432 F. Supp. 1255, 1260 (D. Or. 1977) (three-judge court) ______ (upholding first dollar recordkeeping and partial public disclosure threshold). We hold that first dollar disclosure is not, in all cases, constitutionally proscribed. Because the court below struck down R.I. Gen. Laws 17-25-15(c)(1) on this very ground it said, in essence, that first dollar disclosure necessarily leaves insufficient breathing room for first amendment freedoms, see Vote Choice, 814 F. Supp. at 202 our consideration of the ___ ___________ statute's constitutionality must probe the plaintiffs' other rationales. After all, a judgment, although arrived at by faulty reasoning, still can be sustained on some other ground made manifest by the record. See, e.g., Martel v. Stafford, 992 F.2d ___ ____ ______ ________ 1244, 1245 (1st Cir. 1993); Chongris v. Board of Appeals, 811 ________ _________________ F.2d 36, 37 n.1 (1st Cir.), cert. denied, 403 U.S. 1021 (1987). _____ ______ 14 We turn, then, to the plaintiffs' next theory a theory that shifts from an exclusive focus on whether first dollar disclosure provisions are ever permissible to a more holistic focus on whether Rhode Island's disclosure requirement, considered in light of the state's overall campaign finance law, withstands constitutional scrutiny. B. The Contextual Challenge. B. The Contextual Challenge. ________________________ It is apodictic that courts, when passing upon the constitutionality of a statutory provision, must view it in the context of the whole statutory scheme. See Storer v. Brown, 415 ___ ______ _____ U.S. 724, 737 (1974); Williams v. Rhodes, 393 U.S. 23, 34 (1968). ________ ______ Here, plaintiffs' contextual challenge centers on the disparity between the first dollar disclosure threshold applicable to those who choose to pool money by making contributions to PACs and the $100 disclosure threshold applicable to those who choose to act alone by making direct contributions and expenditures. Compare _______ R.I. Gen. Laws 17-25-15(c)(1) with id. at 17-25-7. ____ ___ Plaintiffs say that this disparity not only burdens PAC contributors' first amendment rights of association but also undermines Rhode Island's boast that first dollar disclosure of PAC contributions represents a rationally selected device geared toward achieving a compelling state interest. We find plaintiffs' analysis to be convincing. The first amendment frowns upon laws which burden associational rights, particularly in the sphere of political speech. The more lopsided the burdens, the more probable it is 15 that a constitutional infirmity looms. Thus, in Berkeley, the ________ Supreme Court struck down a limitation on contributions to PACs, resting its holding not on the impermissibility of the limits per ___ se, but, rather, on the disparity between those limits and the __ limits applicable to persons who, for one reason or another, preferred not to pool their resources: To place a Spartan limit or indeed any limit on individuals wishing to band together to advance their views on a ballot measure, while placing none on individuals acting alone, is clearly a restraint on the right of association. [Laws which] do[] not seek to mute the voice of one individual . . . cannot be allowed to hobble the collective expressions of a group. Berkeley, 454 U.S. at 296. ________ We believe that this passage enunciates three fundamental precepts. First, any law that burdens the rights of individuals to come together for political purposes is suspect and must be viewed warily. Second, burdens which fall exclusively on those who choose to exercise their right to band together, leaving individual speakers unbowed, merit heightened scrutiny. Third, measures which hinder group efforts to make independent expenditures in support of candidates or ballot initiatives are particularly vulnerable to constitutional attack. The first two precepts derive in part from the importance of group expression as a method of amplifying the voices of those with meager means. See FEC v. National Conservative Political ___ ___ ________________________________ Action Comm., 470 U.S. 480, 493-94 (1985) (collecting cases); _____________ Buckley, 424 U.S. at 65-66. The last precept derives in part _______ 16 from the fact that independent expenditures, because they have a more attenuated connection with a particular candidate, are a less likely source for quid pro quo corruption and a questionable ____ ___ ___ indicator of candidate loyalties. See Buckley, 424 U.S. at 39 ___ _______ (noting that independent expenditures are "at the core of our electoral process and of the First Amendment freedoms") (citation and internal quotation marks omitted). In Berkeley, these three precepts coalesced to scuttle ________ a contribution cap. See 454 U.S. at 296. The case at bar is a ___ fair congener. Here, as in Berkeley, the challenged enactment ________ hobbles collective expression by mandating that groups disclose contributors' identities and the extent of their monetary support, no matter how tiny. This, in itself, is a red flag. See Buckley, 424 U.S. at 64 (observing that "compelled ___ _______ disclosure, in itself, can seriously infringe on privacy of association and belief"); id. at 83 (observing that ___ "[c]ontributors of relatively small amounts are likely to be especially sensitive to recording or disclosure of their political preferences"). Here, as in Berkeley, the statute has a ________ much less stringent rule for those who prefer individual expression to collective expression. Here, as in Berkeley, the ________ statute imposes its one-sided burden regardless of whether a group's members have banded together to contribute directly to a candidate or to make independent expenditures concerning a 17 candidate or referendum.9 We think that these three points of comparison accurately foretell that here, as in Berkeley, the ________ statute cannot stand. The state strives valiantly to avoid the force of this comparison. It says that, even if section 17-25-15(c)(1) burdens associational rights to some moderate extent, the law nevertheless merits enforcement under the rubric of legislative prerogative. We disagree. While legislative judgments must be given a wide berth, judicial deference should never be confused with outright capitulation. Federal courts would abdicate their constitutional responsibility if they were to rubber-stamp whatever constructs a state legislative body might propose. And, in any event, judicial deference to legislative line-drawing diminishes when the lines are disconnected, crooked, or uneven. So it is here: the Rhode Island General Assembly has made a series of conflicting judgments about appropriate disclosure thresholds without offering any legally satisfactory explanation for its pererrations. This zigging and zagging is of especial concern because, when citizens engage in first amendment activity affecting elections, the state's interest in disclosure is generally a constant, that is, the state's interest "is the same whether or not [the individual actors] are members of an  ____________________ 9Under Rhode Island law, PACs may form for the exclusive purpose of promoting or opposing ballot questions. See R.I. Gen. ___ Laws 17-25-15(f). A PAC formed for such a purpose is subject to the first dollar disclosure requirement. 18 association." Minnesota State Ethical Practices Bd. v. National ______________________________________ ________ Rifle Ass'n, 761 F.2d 509, 513 (8th Cir. 1985), cert. denied, 474 ___________ _____ ______ U.S. 1082 (1986); see also New Jersey Citizens Action v. Edison ___ ____ __________________________ ______ Township, 797 F.2d 1250, 1265 (3d Cir. 1986) (requiring that ________ government demonstrate a special risk stemming from a particular form of first amendment activity in order to justify disclosure requirements for that form of activity), cert. denied, 479 U.S. _____ ______ 1103 (1987). Rhode Island, in one fell swoop, not only departed from the usual rule of constancy but also imported a particularly virulent strain of unevenness into its statutory scheme: most PACs must disclose the identity of every contributor, regardless of amount, while individual candidates need disclose the identities only of contributors who donate upwards of $100. This imbalance does not cater to any cognizable government interest. It does not serve the state's interest in combatting corruption because corruption can as easily spring from direct contributions to candidates as from contributions that flow through PACs. And, if the danger that tiny contributions will foment corruption is not great enough to justify significant inroads on first amendment rights, see supra ___ _____ Part II(A), it is certainly not great enough to justify disparate treatment of PACs. Similarly, the unevenness does not serve the state's interest in enforcing its contribution limits; after all, the district court found no evidence that PAC contributors might try to subvert the $1,000 cap by an endless stream of $1 donations. See Vote Choice, 814 F. Supp. at 202. ___ ___________ 19 Finally, the interest in an informed citizenry cannot justify the disparity at issue here. To be sure, when contributors' identities are made public, the name of a PAC, standing alone, could in some states have little meaning to a large segment of the electorate. See California Medical Ass'n v. ___ ________________________ FEC, 453 U.S. 182, 201 (1981) (observing that "entities hav[ing] ___ differing structures and purposes . . . may require different forms of regulation in order to protect the integrity of the electoral process"); see also Austin v. Michigan St. Chamber of ___ ____ ______ ________________________ Commerce, 494 U.S. 652, 668 (1990); FEC v. National Right to Work ________ ___ ______________________ Comm., 459 U.S. 197, 210 (1982). But, Rhode Island has guarded _____ against this contingency by requiring that PACs reveal a wide array of information about their goals and purposes. See R.I. ___ Gen. Laws 17-25-15(a); see also supra pp. 3-4. The obvious ___ ____ _____ result of Rhode Island's legislative mosaic is that when a candidate discloses that a particular PAC has given to his or her cause, state law ensures that this fact will signify more about the candidate's loyalties than the disclosed identity of an individual contributor will ordinarily convey. We think this circumstance is properly considered, see Storer, 415 U.S. at 743 ___ ______ (explaining that other state requirements may be considered in evaluating whether a disclosure requirement is sufficiently essential to repel a constitutional challenge); see also ___ ____ Schaumburg v. Citizens for a Better Env't, 444 U.S. 620, 637 & __________ ____________________________ n.11 (1980); Let's Help Fla. v. McCrary, 621 F.2d 195, 200-01 ________________ _______ (5th Cir. 1980), aff'd mem., 454 U.S. 1130 (1982), and it weighs _____ ____ 20 heavily in our conclusion that the claimed justification for the added (first dollar disclosure) burden that Rhode Island imposes on PACs and PAC contributors is more illusory than real. In sum, R.I. Gen. Laws 17-25-15(c)(1) has at least three grave weaknesses. First, by mandating public revelation of all PAC contributors, it burdens the rights of individuals to band together for the purpose of making either independent election expenditures or direct political contributions. Second, by imposing this burden on PACs and PAC contributors while regulating candidates and certain of their financial backers (viz., individuals who contribute directly to candidates rather ____ than to PACs) more loosely, the statute compounds the unfairness of the burden. Finally, the disparity between the two disclosure thresholds (one for PACs and the other for individuals), and, hence, the net burden imposed solely on associational rights, bears no substantial relation to the attainment of any important state interest. Their cumulative effect compels the conclusion that the statute abridges the first amendment.10 We have one more stop to make before leaving this subject. The amici invite us to limit any determination of  ____________________ 10In light of this determination, we need not address a further statutory anomaly: that, while most PACs are held to first dollar disclosure under Rhode Island law, a select group of PACs enjoys preferential treatment. See R.I. Gen. Laws 17-25- ___ 15(c)(1) (exempting PACs sponsored by labor unions and those which are funded through payroll checkoff plans from first dollar disclosure requirements). Similarly, because we decide that Rhode Island's first dollar disclosure provision impermissibly burdens the right to association, we need not determine whether it also violates the equal protection clause. 21 unconstitutionality to the two plaintiff PACs. However, the cases relied on by the amici, see, e.g., FEC v. Massachusetts ___ ____ ___ _____________ Citizens for Life, Inc., 479 U.S. 238 (1986); Brown, 459 U.S. 87, _______________________ _____ involve explicit as-applied challenges to particular statutes. Here, in contrast, plaintiffs mounted a facial attack on R.I. Gen. Laws 17-25-15(c)(1) and the case proceeded below on this theory. Moreover, the reason we invalidate the statute concerns the disparate treatment of PACs qua PACs, and, thus, obtains with ___ equal vigor regardless of which particular PAC may be involved. This is a salient consideration in determining what remedy is appropriate, see, e.g., Sec'y of State v. Joseph H. Munson Co., ___ ____ _______________ _____________________ 467 U.S. 947, 967-68 (1984); City Council of Los Angeles v. ______________________________ Taxpayers for Vincent, 466 U.S. 789, 799-800 (1984), as is the ______________________ fact that our reasoning does not derive its force from situation- specific features. See, e.g., National Treas. Employees Union v. ___ ____ _______________________________ United States, 990 F.2d 1271, 1277-78 (D.C. Cir. 1993). Finally, _____________ only the amici have advocated the limitation-of-remedy position and "[w]e know of no authority which allows an amicus to interject into a case issues which the litigants, whatever their reasons might be, have chosen to ignore." Lane v. First Nat'l ____ ___________ Bank, 871 F.2d 166, 175 (1st Cir. 1989); accord McCoy v. ____ ______ _____ Massachusetts Inst. of Technology, 950 F.2d 13, 23 n.9 (1st Cir. __________________________________ 1991), cert. denied, 112 S. Ct. 1939 (1992). For these reasons, _____ ______ we decline the amici's invitation.11  ____________________ 11For many of the same reasons, we cannot employ the statute's severability provision, R.I. Gen. Laws 17-25-17, to rescue any portion of the first dollar disclosure. 22 To recapitulate, then, we reject both Rhode Island's appeal and the amici's importuning that we apply a Band-Aid in lieu of surgically excising the malignancy. Consequently, we uphold the permanent injunction barring enforcement of R.I. Gen. Laws 17-25-15(c)(1). In striking down the statute, however, we take a narrower path than did the court below. As legislatures must tread carefully in this complicated area, so, too, must courts. We decline to rule out categorically the legislative tool of first dollar disclosure; that tool may in certain contexts although not here serve sufficiently compelling government interests to be upheld. III. LEONARD'S APPEAL III. LEONARD'S APPEAL We have arrived at Leonard's appeal. Before addressing the merits, we resolve the question of standing. A. Standing. A. Standing. ________ Standing doctrine involves "a blend of constitutional requirements and prudential considerations." Valley Forge _____________ Christian Coll. v. Americans United for Separation of Church and _______________ ______________________________________________ State, Inc., 454 U.S. 464, 471 (1982). On the constitutional ___________ side, Article III limits federal court adjudication to matters which achieve the stature of justiciable cases or controversies. Ordinarily, this means that a party invoking the court's authority must show: (1) that he or she has suffered some actual or threatened injury as a result of the defendant's putatively illegal conduct, (2) that the injury may fairly be traced to the 23 challenged action, and (3) that a favorable decision will likely redress the injury. See Riverside v. McLaughlin, 111 S. Ct. ___ _________ __________ 1661, 1667 (1991); Valley Forge, 454 U.S. at 472. We have ____________ cautioned that "[t]he ingredients of standing are imprecise and not easily susceptible to concrete definitions or mechanical application." United States v. AVX Corp., 962 F.2d 108, 113 (1st _____________ _________ Cir. 1992). When declaring her candidacy, Leonard had to make an irrevocable commitment either to shun or to embrace public financing. Leonard's testimony suggests that, having decided to forgo the embrace, she had to structure her campaign to account for her adversaries' potential receipt of television time, fundraising advantages, and the like. Her opponent in the Republican primary, Mayor Levesque, opted for public financing. Leonard testified that Levesque accepted contributions over $1,000 while she had to turn away similar contributions. What is more, because one of the two major candidates in the Democratic gubernatorial primary also opted for public funding, Leonard had to plan for the possibility that a publicly financed candidate would oppose her in the general election. Based on this and other evidence, the district court's finding that the coerced choice between public and private financing "colored [Leonard's] campaign strategy from the outset," Vote Choice, 814 F. Supp. at 204, seems unimpugnable. ____________ In our view, such an impact on the strategy and conduct of an office-seeker's political campaign constitutes an injury of a 24 kind sufficient to confer standing. See Buckley, 424 U.S. at 12 ___ _______ & n.10 (determining that standing existed in a case where certain candidates challenged disparate rules and contribution caps); Storer, 415 U.S. at 738 n.9 (noting that simply being subjected ______ to election law requirements, even indirectly, may constitute cognizable injury); see also AVX Corp., 962 F.2d at 113-14 ___ ____ __________ (defining "injury"). Therefore, Leonard satisfies the first furculum of the test. Leonard also possesses the remaining attributes of constitutional standing. The injury she suffered can be traced directly to the state's actions: the statutory provisions, and the Board's implementation of them, caused the harm of which Leonard complains. As to redressability, Leonard seeks a permanent injunction against continued enforcement of the very statutes which caused her injury. This produces the necessary causal connection between the injury alleged and the relief requested.12 See, e.g., Allen v. Wright, 468 U.S. 737, 753 ___ ____ _____ ______ n.19 (1984). Over and above its constitutional requisites, "the  ____________________ 12The Board suggests that this causal link snapped once the general election concluded, thereby rendering the case moot. We disagree. There is a recognized exception to the mootness doctrine for matters capable of repetition yet evading review. This is such a case. The injury Leonard seeks to palliate was too fleeting to be litigated fully prior to the climax of the gubernatorial campaign and, since there is a reasonable expectation that Leonard will encounter the same barrier again after all, she has not renounced possible future candidacies, and politicians, as a rule, are not easily discouraged in the pursuit of high elective office the exception applies. See Democratic ___ __________ Party of the U.S. v. Wisconsin, 450 U.S. 107, 115 n.13 (1981); __________________ _________ Bellotti, 435 U.S. at 774. ________ 25 doctrine of standing also embodies prudential concerns regarding the proper exercise of federal jurisdiction." AVX Corp., 962 __________ F.2d at 114. Leonard's case qualifies on this score as well. In the interest of expedition, we refer the reader who hungers for detail to the district court's erudite discussion of this point. See Vote Choice, 814 F. Supp. at 204. We add only that Leonard ___ ___________ is asserting her own rights and interests (not someone else's); that her grievances are particularized and concrete; and that her claim falls well within the zone of interests protected by the first amendment. No more is exigible. See, e.g., Allen, 468 ___ ____ _____ U.S. at 751; Warth v. Seldin, 422 U.S. 490, 499-500 (1975); _____ ______ Association of Data Processing Serv. Orgs. v. Camp, 397 U.S. 150, __________________________________________ ____ 153 (1970). Thus, Leonard has standing to pursue her quest. B. The Contribution Cap Gap. B. The Contribution Cap Gap. ________________________ Leonard has questioned several different provisions of the statute. We turn initially to her claim that the contribution cap gap is inimical to the first amendment.13 In reaching this issue, we stress that Leonard assails only the disparity between the two caps; she voices no in vacuo challenge __ _____ to the $1,000 cap applicable to candidates, such as herself, who eschew public funding. Leonard's serenade has two themes. Her major theme is  ____________________ 13Under Rhode Island law, contributions to political campaigns are customarily capped at $1,000 per donor. See R.I. ___ Gen. Laws 17-25-10.1. However, a candidate who qualifies for public funds is entitled to receive contributions in amounts up to $2,000 per donor. See id. at 17-25-30(3). This disparity ___ ___ constitutes the contribution cap gap of which Leonard complains. 26 that regulatory disparities of this type are inherently impermissible. Her minor theme is that the cap gap burdens her first amendment rights without serving a corresponding governmental interest. We consider these asseverations sequentially, affording plenary review. See LeBlanc, 992 F.2d at ___ _______ 396. 1. The Per Se Challenge. Leonard's per se challenge 1. The Per Se Challenge. _____________________ ___ __ to the contribution cap gap boils down to the assertion that, whenever government constructs incentives for candidates to accept fundraising limits, it departs from its required role as an umpire and becomes a player in the electoral process, much like, say, a referee who eases the rules for one team and not the other. The most immediate barrier to the success of this argument is that the Supreme Court has upheld a very direct and tangible incentive: the provision of public funds to candidates who agree to place decreased reliance on private campaign contributions. See Buckley, 424 U.S. at 85-109; see also ___ _______ ___ ____ Republican Nat'l Comm. v. FEC, 487 F. Supp. 280, 283-86 ________________________ ___ (S.D.N.Y.) (three-judge court) (RNC I), aff'd mem., 445 U.S. 955 _____ _____ ____ (1980); Republican Nat'l Comm. v. FEC, 616 F.2d 1, 2 (2d Cir.) _______________________ ___ (en banc) (adopting reasoning of RNC I in parallel proceeding), __ ____ ______ aff'd mem., 445 U.S. 955 (1980). _____ ____ In a Briarean effort to scale this barrier, Leonard attempts to distinguish the public financing cases on the ground that they involve the propriety of conferring benefits in contrast to imposing penalties. She is fishing in an empty pond. 27 For one thing, the distinction that Leonard struggles to draw between denying the carrot and striking with the stick is, in many contexts, more semantic than substantive. This case illustrates the point. The question whether Rhode Island's system of public financing imposes a penalty on non-complying candidates or, instead, confers a benefit on those who do comply is a non-issue, roughly comparable to bickering over whether a glass is half full or half empty. After all, there is nothing inherently penal about a $1,000 contribution cap. For another thing, to the degree that the question does have a concrete answer, the answer appears contrary to the one Leonard suggests. Leonard has adduced no legislative history or other evidence suggestive of punitive purpose. Moreover, the Rhode Island statute sets up a $1,000 cap as the norm and doubles the cap only if a candidate meets certain conditions. Logic suggests that the higher cap is, therefore, a premium earned by meeting statutory eligibility requirements rather than a penalty imposed on those who either cannot or will not satisfy the requirements. Third, the blurred line between benefit denials and penalties is singularly unhelpful in the zero-sum world of elective politics. Because a head-to-head election has a single victor, any benefit conferred on one candidate is the effective ___ equivalent of a penalty imposed on all other aspirants for the same office. In the last analysis, then, Leonard's fancied distinction proves too much. 28 While these three reasons spell defeat for Leonard's attempt to distinguish the public financing cases as different in kind from this case, Leonard also proffers a difference-in-degree distinction. Even if some regulatory incentives may be permissible, she says, Rhode Island's incentives are so strong that they destroy the voluntariness of the public financing system and, therefore, cannot be condoned. We agree with Leonard's main premise: voluntariness has proven to be an important factor in judicial ratification of government-sponsored campaign financing schemes. See, e.g., ___ ____ Buckley, 424 U.S. at 95; RNC I, 487 F. Supp. at 285. Coerced _______ _____ compliance with fundraising caps and other eligibility requirements would raise serious, perhaps fatal, objections to a system like Rhode Island's. Furthermore, there is a point at which regulatory incentives stray beyond the pale, creating disparities so profound that they become impermissibly coercive. It is, however, pellucid that no such compulsion occurred here. Rhode Island's law achieves a rough proportionality between the advantages available to complying candidates (including the cap gap) and the restrictions that such candidates must accept to receive these advantages.14 Put another way,  ____________________ 14Indeed, the specific facts of Rhode Island's 1992 gubernatorial contest support the conclusion that the state's catalog of incentives is neither overly coercive nor even especially attractive. Both Leonard and Governor Sundlun (who prevailed in the Democratic primary and eventually won the general election) resisted the temptations of public funding despite facing (a) an opponent in the primary who had opted for public funding and (b) a substantial possibility that the other party's candidate in the general election would be receiving such 29 the state exacts a fair price from complying candidates in exchange for receipt of the challenged benefits. While we agree with Leonard that Rhode Island's statutory scheme is not in exact balance we suspect that very few campaign financing schemes ever achieve perfect equipoise we disagree with her claim that the law is unfairly coercive. Where, as here, a non-complying candidate suffers no more than "a countervailing denial," the statute does not go too far. Buckley, 424 U.S. at 95. _______ To sum up, the implication of the public funding cases is that the government may legitimately provide candidates with a choice among different packages of benefits and regulatory requirements. Rhode Island has done nothing more than implement this principle. We see no sign that the state has crossed into forbidden territory; the contribution cap gap, as structured by the Rhode Island General Assembly, neither penalizes certain classes of office-seekers nor coerces candidates into surrendering their first amendment rights. In short, Leonard has identified no inherent constitutional defect in the state's voluntary, choice-increasing framework. 2. The Burden/Justification Matrix. Leonard keeps on 2. The Burden/Justification Matrix. ________________________________ trucking. She asserts that, even if the cap gap does not penalize or coerce, it nonetheless burdens her first amendment rights without sufficient justification. The assertion stalls. In the first place, we have difficulty believing that a statutory framework which merely presents candidates with a  ____________________ funds. 30 voluntary alternative to an otherwise applicable, assuredly constitutional, financing option imposes any burden on first amendment rights. In choosing between the ordinary methods of financing a campaign methods which are themselves subject to certain restrictions and the public funding alternative which limits both fundraising and expenditures a candidate will presumably select the option which enhances his or her powers of communication and association. See Buckley, 424 U.S. at 92-93; ___ _______ RNC I, 487 F. Supp. at 285. Thus, it seems likely that the _____ challenged statute furthers, rather than smothers, first amendment values. In the second place, even if the cap gap burdens a non- complying candidate's first amendment rights to some small extent, and assuming for argument's sake that the state bears the devoir of persuasion in respect to whether the statutory framework is both in service to a compelling governmental interest and tailored in a sufficiently narrow manner, we would still find Leonard's thesis unpersuasive. The state need not be completely neutral on the matter of public financing of elections. When, as now, the legislature has adopted a public funding alternative, the state possesses a valid interest in having candidates accept public financing because such programs "facilitate communication by candidates with the electorate," Buckley, 424 U.S. at 91, free candidates from the pressures of _______ fundraising, see id., and, relatedly, tend to combat corruption. ___ ___ See id.; see also RNC I, 487 F. Supp. at 285-86. Establishing ___ ___ ___ ____ _____ 31 unequal contribution caps serves this multifaceted network of interests by making it more probable that candidates will choose to partake of public financing. Equally important, the gap appears to reflect a carefully calibrated legislative choice anent the differential risk of quid pro quo corruption in the two ____ ___ ___ instances. In the state's view, the many eligibility requirements for public financing make it less likely that a given contribution will tend to corrupt a candidate.15 That view, too, is plausible. Ergo, the contribution cap gap stands on reasonably solid theoretical footing. For these reasons, we find Rhode Island's contribution cap gap narrowly tailored and logically related, in scope, size, and kind, to compelling governmental interests.16 That being  ____________________ 15To cite an example, once it is clear that a publicly financed candidate's campaign can reach the overall fundraising limits, see R.I. Gen. Laws 17-25-20(2), any single contributor ___ to that campaign becomes less important because the contributor can be "replaced" at no marginal cost. In other words, the fact that the campaign seems bound to reach the fundraising ceiling means that a given contributor is occupying a contribution slot that could as easily be occupied by someone else. With this distinction in the importance of individual contributors comes a corresponding diminution in the risk of corruption and, therefore, a diminished justification for stringent contribution limits. See, e.g., Buckley, 424 U.S. at 91, 96. ___ ____ _______ 16We add a caveat. We do not in any way imply that the contribution cap gap is constitutionally mandated. A state legislature could certainly conclude that a $2,000 contributor to a campaign complying with the spending limits actually holds a greater sway with the candidate than does a $1,000 contributor to an unlimited campaign because the former contribution represents, in most cases, a greater percentage of the candidate's kitty than does the latter. But, the legislature must have a certain amount of operating room in this sphere. The first amendment does not require the courts to choose sides, at this level of particularity, in the flux and reflux of policy considerations. 32 so, it would be unduly meddlesome, hence, wrong, for us to substitute our own assessment of either an incentive's value or the perceived risks to which it is addressed for the considered judgment of a state legislature. See Nat'l Right to Work, 459 ___ ____________________ U.S. at 210 (expressing reluctance to "second-guess a legislative determination as to the need for prophylactic measures where corruption is the evil feared"); Baker v. City of Concord, 916 _____ ________________ F.2d 744, 750 (1st Cir. 1990) (discussing impropriety of federal courts second-guessing a state's legislative judgments). 3. Recapitulation. We hold that states may sometimes 3. Recapitulation. ______________ legitimately confront candidates with the option of choosing among different packages of benefits and regulatory requirements. We hold further that such a permissible choice occurs where, as here, there is no credible evidence of a penalizing purpose, the choice between the packages is real, uncoerced, and available to all, the status quo option, standing alone, raises no red flags, and the challenged disparity is narrowly tailored and logically related, in scope, size, and kind, to compelling governmental interests. See, e.g., Buckley, 424 U.S. at 29, 35-36 (upholding ___ ____ _______ disparate contribution caps for individuals and PACs). Because Rhode Island's contribution cap gap does not penalize, coerce, or unjustifiably burden first amendment rights, the district court appropriately upheld the challenged provision.17  ____________________ 17We do not tarry over Leonard's claim that the contribution cap gap violates her right to equal protection. First, the statute does not impose unequal treatment but gives candidates an authentic choice. Second, the statute treats candidates differently on the basis of their actions rather than their 33 C. The Free-Television-Time Provisions. C. The Free-Television-Time Provisions. ___________________________________ We now examine Leonard's remonstrance against Rhode Island's offer of free television time to candidates who comply with the eligibility criteria for public financing. Since the issues are purely legal, we afford plenary review. 1. Setting the Stage. To understand the free- 1. Setting the Stage. ___________________ television-time incentives that have raised Leonard's hackles, a further exegesis is helpful. Under this heading, Leonard attacks two different grants of in-kind assistance to gubernatorial candidates who accept public financing. One such incentive is limned in R.I. Gen. Laws 17-25-30(1), which entitles a complying candidate to "free time on community antenna television" pursuant to rules to be formulated by the state Division of Public Utilities (DPU).18 The second such  ____________________ beliefs actions which, as we have seen, possess differing implications for the integrity and effectiveness of the electoral process. The equal protection clause does not interdict such classifications. See, e.g., Bray v. Alexandria Women's Health ___ ____ ____ __________________________ Clinic, 113 S. Ct. 753, 760-62 (1993) (collecting cases ______ illustrating courts' denials of equal protection claims despite statutes' unintended disparate effects on protected classes); Buckley, 424 U.S. at 95 (upholding against equal protection _______ attack a system which actually excluded minority party candidates); Jenness v. Fortson, 403 U.S. 431, 441-42 (1971) _______ _______ (rejecting equal protection challenge to election law and observing that "[s]ometimes the grossest discrimination can lie in treating things that are different as though they were exactly alike"). 18Community antenna television (CATV) is a form of television cablecasting regulated by the state DPU. See R.I. ___ Gen. Laws 39-19-6. Under current regulations and applicable franchise agreements, cable operators dedicate one or more CATV channels to the state to ensure public access. See DPU Rules ___ Governing CATV Systems, 14.1 (Jan. 14, 1983 rev.). The parties do not dispute the DPU's authority to write additional regulations implementing section 17-25-30(1) by providing free 34 incentive is outlined in R.I. Gen. Laws 17-25-30(2), which entitles a complying candidate to "free time on any public broadcasting station" operating under the jurisdiction of the Rhode Island Public Telecommunications Authority (PTA).19 2. Preemption. Leonard's attack on the free- 2. Preemption. __________ television-time provisions proceeds on two fronts. Initially, she contends that the Federal Communications Act (FCA) preempts conflicting state laws, and that R.I. Gen. Laws 17-25-30 comes within this proscription.20 We find no such irreconcilable conflict. The FCA reads in relevant part: If any licensee shall permit any person who is a legally qualified candidate for public office to use a broadcasting station [or CATV system], he shall afford equal opportunities to all other such candidates for that office in the use of such broadcasting station [or CATV system]. 47 U.S.C. 315(a), (c). This guarantee of equal opportunity has  ____________________ CATV time to candidates. By like token, the parties do not dispute that, if the DPU did promulgate such regulations, federal communications law would apply. 19The state, through the PTA, owns and controls the air time provided by section 17-25-30(2). The PTA is a public corporation empowered to hold property and licenses in trust for the state. See R.I. Gen. Laws 16-61-2. As such, the PTA is required to ___ "establish, own and operate" public broadcasting in the state, to "apply for, receive and hold" the necessary licenses from the Federal Communications Commission, and to exercise control over programming on public television stations. See id. at 16-61-6. ___ ___ We take judicial notice that the PTA currently operates WSBE-TV, Channel 36. 20Leonard does not argue that Congress preempted state regulation by occupying the entire communications field. See, ___ e.g., Schneidewind v. ANR Pipeline Co., 485 U.S. 293, 300 (1988); ____ ____________ ________________ French v. Pan Am Express, Inc., 869 F.2d 1, 4 (1st Cir. 1989). ______ ____________________ 35 both quantitative and qualitative dimensions. See Paulsen v. ___ _______ FCC, 491 F.2d 887, 889 (9th Cir. 1974). Among other things, it ___ "encompasses such elements as hour of the day, duration, and charges." Kennedy for President Comm. v. FCC, 636 F.2d 432, 438 ___________________________ ___ (D.C. Cir. 1980). Whether this federal guarantee preempts Rhode Island's free-television-time provisions depends upon how one interprets state law. Leonard argues that in explicitly guaranteeing state- controlled television time to qualifying candidates at no cost, the state intends to exclude all other (non-publicly-funded) candidates from receiving comparable treatment. Any alternate interpretation of the statute, she claims, would render it purposeless. We think Leonard's argument is deeply flawed. When a statute provides a benefit to some, it does not necessarily bar receipt of the benefit by others. Cf., e.g., Bowen v. Owens, 476 ___ ____ _____ _____ U.S. 340, 347 (1986) (explaining that a legislative body "may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind") (citation and internal quotation marks omitted); Baker, 916 F.2d _____ at 748 (holding that a state legislature may constitutionally elect to address "only one aspect or a few aspects of a multifaceted problem"). Put in concrete terms applicable to this case, the Rhode Island statute grants free television time to candidates who embrace public funding but it does not purport to prevent privately financed candidates from reaping the same 36 benefit if some other law here, the FCA requires equal treatment. It is, moreover, axiomatic that, when a state legislature has sounded an uncertain trumpet, a federal court charged with interpreting the statute ought, if possible, choose a reading that will harmonize the statute with constitutional understandings and overriding federal law. See 1A Norman J. ___ Singer, Sutherland Statutory Construction 23.21 (4th ed. 1985 & _________________________________ Supp. 1993) (collecting Supreme Court cases); EEOC v. ____ Massachusetts, 987 F.2d 64, 70 (1st Cir. 1993). We believe these _____________ principles apply full bore to R.I. Gen. Laws 17-25-30. We refuse to read Rhode Island's provision of in-kind benefits in the overbold fashion that Leonard envisions. Instead, we interpret the statute to mean what it says and only what it says: it entitles publicly funded candidates to use state-controlled television channels without charge but it does nothing to interfere with, and does not contemplate interfering with, the rights of privately financed candidates who wish to petition for equal time and treatment under 47 U.S.C. 315. Contrary to Leonard's suggestion, this interpretation does not emasculate R.I. Gen. Laws 17-25-30(1) & (2); indeed, by harmonizing the statutory provisions with federal law and avoiding possible preemption, the interpretation lends considerable vitality to the will of the state legislature. What is more, the provisions, so construed, further a substantial purpose: subsidizing all publicly funded candidates by providing 37 them with access to free television time. In other words, the state law makes the public financing program more attractive not because complying candidates receive something which their non- complying counterparts do not, but, rather, because complying candidates can be confident that the expenditure limits imposed in consequence of the acceptance of public financing will not prevent them from getting their message to the voters. The bottom line reads as follows: there are no indications textual or otherwise that Rhode Island's free- television-time provisions aim to preclude non-complying candidates from seeking either equal time or equal treatment; there is a plausible interpretation of the state enactment which reconciles it with overriding federal law; and this interpretation gives the statute meaning without jeopardizing its validity. Because we read the state law in this way,21 47 U.S.C. 315 does not preempt R.I. Gen. Laws 17-25-30(1) & (2). 3. Excessive Entanglement. Leonard has one last shot 3. Excessive Entanglement. ______________________ in her sling. She urges that the provision of in-kind benefits, such as free television time, has a dangerous tendency to entangle government in the internal workings of political campaigns. The electoral process is guided by legislatively  ____________________ 21This interpretation of R.I. Gen. Laws 17-25-30 requires that we reject three other disparity-presuming contentions advanced by Leonard. Read in the manner that we deem fitting, the statute neither (1) penalizes a candidate for exercising his or her right to boycott public financing, (2) denies equal protection of the laws to such a candidate, nor (3) destroys the voluntariness of the public financing program. 38 articulated rules designed to ensure fairness. A fine, but important, line exists between this salutary rulemaking and meddlesome interference in the conduct of elections. There is a point where government involvement in the operation of political campaigns may become so pervasive as to imperil first amendment values. Were a state to loan out its workers as campaign consultants, for example, voters and candidates might legitimately complain that it had gone beyond laying down general rules for office-seekers and begun tampering with, or even manipulating, the electoral process. Such entanglement could conceivably prevent the first amendment from accomplishing its fundamental mission in respect to political speech: "to secure the widest possible dissemination of information from diverse and antagonistic sources, and to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people." Buckley, 424 U.S. at 49 (citations and _______ internal quotation marks omitted). In short, entanglement of this insidious stripe runs too great a risk of creating a convergence of pro-government voices. Mindful of these concerns, courts must carefully review legislative enactments that potentially entangle government in partisan political affairs. In-kind incentives carry the seeds of potential overinvolvement, especially when they implicate access to state-run organs of communication. Nevertheless, the first amendment does not rule out all in-kind offerings simply because some of them may be too entangling. See, e.g., id. at 93 ___ ____ ___ 39 n.127 (noting that the government's extension of postal privileges furthers first amendment values). Legislative bodies (and, ultimately, courts) must separate wheat from chaff, recognizing that, while some in-kind benefits may be excessively entangling, others represent valid and innovative attempts to confront new concerns in the ever-changing world of democratic elections. In our view, there is a spectrum of government subsidization ranging from pure white and light gray a range that would include such relatively unintrusive measures as supplying public funding on politically neutral terms to jet black and navy blue a range that would subsume such relatively intrusive measures as furnishing campaign workers to specific candidates. The closer an arrangement trenches to the non- intrusive end of the spectrum, the less likely it is to fall prey to a facial challenge grounded in the first amendment. After all, so long as interference is slight, offering in-kind benefits actually furthers first amendment values by increasing candidates' available choices and enhancing their ability to communicate. See id. at 92-93.  ___ ___ In this case, Leonard has advanced no concrete reason for believing that the free-television-time provisions will excessively entangle the state in the day-to-day details and decisions of the campaign. Because applicable federal laws and regulations require equal time and treatment for all competing candidates insofar as the electronic media are concerned, there 40 is no appreciable danger of lopsided state involvement in the intricate process of scheduling television appearances. By like token, there is no demonstrable risk that state power will influence candidates' speech in a way that undermines first amendment values. Accordingly, there is no excessive entanglement. See, e.g., id. at 93 n.126 (concluding that claims ___ ____ ___ of excessive governmental involvement in respect to public funding of political campaigns were "wholly speculative and hardly a basis for [facial] invalidation"). IV. CONCLUSION IV. CONCLUSION In its journey to ensure the integrity of the electoral process, a state legislature must march across the hallowed ground on which fundamental first amendment rights take root. The terrain must be negotiated with circumspection and care: disparities, in whatever guise, are not casually to be condoned. Here, the Rhode Island General Assembly traversed the minefield with mixed results. The disclosure threshold for PAC contributors, as contrasted with the different disclosure threshold for contributors to candidates, creates an impermissible disparity violative of associational rights. A second claimed disparity, involving the contribution cap gap is, in part due to its relatively small size, non-penalizing, non- coercive, justifiable, and, hence, constitutional. For all intents and purposes, the third claimed disparity is virtually non-existent: given the imperatives of extant federal law, the free-television-time provisions of the state statute do not produce significant differences in the benefits available to various candidates for the same office. Thus, we, like the court 41 below, find that R.I. Gen. Laws 17-25-15(c)(1) is unconstitutional, but that the plaintiffs' challenges to other portions of Rhode Island's campaign finance law are bootless. Nihilo ulterius requiremus pergere. The judgment below ______ ________ __________ _______ will be Affirmed. Affirmed. ________ 42